ROBERT HADER, Plaintiff-Appellee, v. ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, Defendant and Counterdefendant-Appellant (Terminal Railroad Association of St. Louis, Defendant and Counterplaintiff-Appellee).

Fifth District No. 5—89—0793

Opinion filed January 2, 1991.—Rehearing denied February 25, 1991.

1002

John B. Gunn and Leslie G. Offergeld, both of Walker & Williams, P.C., of Belleville, for appellant.

Richard M. Roessler and Kenneth L. Halvachs, both of Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, Robert Hader, filed suit against his employer, defendant, St. Louis Southwestern Railway Company (hereinafter the Cotton-belt), under the Federal Employers Liability Act (the Act) (45 U.S.C.

§51 *et seq.* (1986)) and against codefendant, counterplaintiff, the Terminal Railroad Association of St. Louis (hereinafter the Terminal), for negligence. Plaintiff reached settlement agreements with both defendants. The Terminal filed a counterclaim against the Cottonbelt for indemnity based on a contract entered into between the parties. In this cause, the Cottonbelt appeals from an order of the circuit court of Madison County granting the Terminal's motion for summary judgment, finding that the language of the indemnity agreement required the Cottonbelt to indemnify the Terminal and granting the Terminal's motion to strike an affirmative defense filed by the Cottonbelt. In this cause, the Cottonbelt raises the following issues: (1) whether the trial court erred in denying the Cottonbelt's motion for change of venue, (2) whether the injury incurred by plaintiff was within the scope of injuries for which the indemnification agreement was intended, (3) whether the language of the indemnity agreement expressed a clear and unequivocal intention to indemnify the Terminal for its own negligence, (4) whether the trial court erred in ruling that the affirmative defense of acquiescence was inapplicable, and (5) whether the Cottonbelt is entitled to further proceedings to ascertain whether the settlement between the Terminal and plaintiff included money for punitive damages. We affirm.

The facts of this case are not disputed. On November 25, 1985, plaintiff, an employee of the Cottonbelt, was working on a Cottonbelt train engaged in transfer operations which required crossing the Terminal's main line track in St. Louis, Missouri. Prior to the Cottonbelt train being routed through the Terminal's main line, a Terminal crew had proceeded across the same portion of track performing switching movements. At the Newspaper Dealers' spur track, the Terminal train crew noticed that the main line switch was lined "wrong," meaning that it led into the spur track instead of the main line. The Terminal train crew correctly aligned the switch and locked it; however, because the lock had been tampered with, the switch arm could again be forced over even with the lock in place. The Terminal crew reported the "bad lock" to its dispatcher at approximately 5:21 p.m. The dispatcher knew that a "bad lock" meant that the lock would not prevent the switch from being altered.

At approximately 6:11 p.m., the Cottonbelt train on which plaintiff was working approached the Newspaper Dealers' switch. The Cottonbelt crew had been given clearance to proceed on this route by the Terminal's dispatcher, but the dispatcher failed to give warning that the Newspaper Dealers' switch had been tampered with or that there was a "bad lock" on the switch. The light at the Newspaper Dealers'

switch showed green, meaning that the main line was clear for entry. Upon coming closer to the switch, plaintiff noticed that the switch points were lined incorrectly. The Cottonbelt train was headed for the spur track instead of the main line. When plaintiff noticed this error, he yelled, "big hole," which told the engineer to make an emergency stop. The train was unable to stop and headed onto the spur track. Plaintiff went to the side door and was intending to dismount when the train on which he was riding collided with an empty hopper car owned by Enron Chemical Company, but recently switched onto the spur track by the Terminal train crew. Plaintiff was knocked off the train car and seriously injured.

It was later determined that vandals had again thrown the switch lock and tampered with the target after the Terminal train crew had corrected the problem at 5:21 p.m. Had the Terminal dispatcher reported the potential for vandalism at the Newspaper Dealers' switch to the Cottonbelt train crew, the Cottonbelt crew could have been on the lookout for potential problems and the accident most likely could have been avoided. There were frequent reports of vandalism in this area. The Terminal was aware of the vandalism and was aware of the technology that could have prevented the switch arm from being thrown. For a relatively inexpensive price, a "collar" could have been placed on the lock preventing vandals from tampering with the locks.

On December 27, 1985, plaintiff filed a lawsuit against the Cottonbelt under the Act and against the Terminal for negligence. The count against the Terminal was later amended, adding a count for punitive damages. The Terminal also filed a counterclaim against the Cottonbelt for indemnity. A settlement hearing was held on April 3, 1989. At that time, all parties were present through their attorneys. Settlements in the amount of $1 million between plaintiff and the Cottonbelt and $1,250,000 between plaintiff and the Terminal were ultimately concluded. The punitive damages count filed against the Terminal was dismissed. Counsel for the Cottonbelt did not object to the good-faith nature of the settlement, nor did he object to plaintiff's counsel's representation that no part of the $1,250,000 constituted a punitive damage award. At the conclusion of this hearing, it was determined that the only remaining issue was the Terminal's counterclaim for indemnity.

On October 24, 1989, the trial court entered its order granting the Terminal's motion for summary judgment and entering judgment thereon in favor of the Terminal and against the Cottonbelt in the amount of $1,250,000. In its order, the trial court ruled that the language of the indemnity agreement required the Cottonbelt to indem-

nify the Terminal under the undisputed facts of the case. The indemnity agreement was based upon a long-standing contract for the use of the Terminal's track. In 1902, the Rock Island Railroad entered into a written agreement with the Terminal for the use of the Terminal's track between Rock Island Junction and Carrie Avenue in St. Louis, Missouri. The area where the instant incident occurred is included in this stretch of track. The Cottonbelt purchased the Rock Island and became the successor in interest to Rock Island's rights and liabilities under the 1902 agreement. On December 27, 1983, the Cottonbelt requested a change in billing procedures, a change to which the Terminal agreed, provided that certain indemnification provisions be included. The Cottonbelt agreed to these provisions, and on April 1, 1984, the provisions became part of the contract between the parties and were in effect at the time of the instant occurrence. The trial court also granted the Terminal's motion to strike the Cottonbelt's affirmative defense of acquiescence.

There is one additional pertinent fact. On January 23, 1989, the Cottonbelt filed a petition for change of venue alleging prejudice of the trial judge. The trial judge denied the Cottonbelt's petition.

The first issue we are asked to address is whether the trial court erred in denying the Cottonbelt's motion for a change of venue. The Cottonbelt asserts that the right to a change of venue due to the alleged prejudice of the trial judge is absolute, providing that the trial judge has not made a substantial ruling in the case. (*In re Marriage of Birt* (1987), 157 Ill. App. 3d 363, 366, 510 N.E.2d 559, 561.) The Cottonbelt then argues that in the instant case, the trial judge had not made any substantial rulings prior to its motion for change of venue so that the trial court erred in denying the Cottonbelt's motion. The Terminal replies that the trial court did not err in denying the Cottonbelt's motion for change of venue because the Cottonbelt ascertained the trial court's position on substantial rulings, in particular, the Cottonbelt's motion to continue and motion to bar two of plaintiff's expert witnesses prior to seeking a change of venue.

■■ Section 2—1001(a)(2) of the Code of Civil Procedure provides:

"(a) A change of venue in any civil action may be had in the following situations:

\*\*\*

(2) Where any party or his or her attorney fears that he or she will not receive a fair trial in the court in which the action is pending, because the inhabitants of the county are or the judge is prejudiced against him or her, or his or her

attorney, or the adverse party has an undue influence over the minds of the inhabitants. In any such situation the venue shall not be changed except upon application, as provided herein, or by consent of the parties." (Ill. Rev. Stat. 1987, ch. 110, par. 2—1001(a)(2).)

The right to a change of venue is absolute where a motion alleging prejudice of the judge is filed before trial or hearing and before the judge presiding in the case has made any substantial ruling. (*Stoller v. Paul Revere Life Insurance Co.* (1987), 163 Ill. App. 3d 438, 517 N.E.2d 5.) The reason behind such a principle is that one should not be compelled to plead his cause before a judge who is prejudiced, whether actually or only by suspicion. The corollary to this principle, however, is that a petition for change of venue must be brought at the earliest practical moment in order to prohibit a litigant from seeking a change of venue only after he has formed an opinion, based upon the court's adverse rulings, that the judge may be unfavorably disposed toward his case. (*Becker v. R.E. Cooper Corp.* (1990), 193 Ill. App. 3d 459, 462, 550 N.E.2d 236, 238.) The law is clear that a party should not be allowed to "judge shop" until he or she finds a jurist who is favorably disposed to his cause of action. (*Becker*, 193 Ill. App. 3d at 462, 550 N.E.2d at 238; *In re Marriage of Passiales* (1986), 144 Ill. App. 3d 629, 637, 494 N.E.2d 541, 548; *In re Marriage of Zannis* (1983), 114 Ill. App. 3d 1034, 1038, 449 N.E.2d 892, 895.) It has previously been held that a petition based upon a general allegation of prejudice is untimely if brought after a hearing on the merits has started or the trial court has ruled on a substantial issue in the cause. (*Heman v. Jefferson* (1985), 136 Ill. App. 3d 745, 750-51, 483 N.E.2d 537, 542.) Moreover, if it is apparent that the request for a change of venue is made only to delay or avoid trial, the denial of the petition does not constitute error. (*Hoffmann v. Hoffmann* (1968), 40 Ill. 2d 344, 239 N.E.2d 792.) Therefore, we believe the questions are whether the Cottonbelt's motion for a change of venue was motivated for purpose of delaying trial or whether the Cottonbelt was "judge shopping." After reviewing the record, we conclude that the Cottonbelt's attorney was both attempting to delay the trial and "judge shopping."

The record shows that the case was originally filed on December 27, 1985. On January 23, 1989, a pretrial conference was held. On that date, the Cottonbelt filed three motions: (1) a motion to continue, (2) a motion to bar certain plaintiff's expert witnesses, and (3) a petition for change of venue based upon the alleged prejudice of the trial judge. At the hearing on that date, the trial court had the attorneys

identify themselves for the record. The Cottonbelt's attorney, without prompting, then stated: "Your Honor, I think the first thing that we should take up is the motion for continuance, although we have several motions pending." The Cottonbelt's attorney then argued for nearly eight pages of transcript his reasons for needing a continuance, which were based in large part on his desire to take a vacation. After the Cottonbelt's attorney's lengthy argument, the trial court then gave the other attorneys an opportunity to address both the continuance issue and the motion to bar plaintiff's experts. The trial court then stated: "I really haven't heard anything yet warranting a continuance. *** I reserve my right if someone shows severe prejudice for the defendant." After a reading of the complete transcript of the January 23, 1989, hearing, it is apparent to us that the parties would have been led to believe that the trial judge was going to deny the Cottonbelt's motion for continuance. The transcript of the January 23, 1989, hearing lacks any discussion of the Cottonbelt's motion for change of venue. The motions were continued, and on January 27, 1989, the parties again appeared before the trial court. The court allowed the parties to identify themselves for the record and then stated:

> "THE COURT: I just noticed in the file, gentlemen, a Petition for Change of Venue was filed by one of the defendants. Perhaps the Court will proceed. I guess we'll have to take that up I would think."

The Cottonbelt's attorney replied:

> "MR. GUNN: Yes, sir. Well, the defendant St. Louis Southwestern Railway Company has filed a Motion to Substitute relying on the statutory provisions and that it's our contention that the trial judge does not rule on any substantive matters as of this date and the change can be taken."

Plaintiff's attorney replied that he believed that the Cottonbelt had already gotten the "flavor or feeling" for the way the judge planned to rule on at least the motion to continue, so that the Cottonbelt's motion for change of venue should be denied. The trial court agreed and denied the Cottonbelt's motion for change of venue. The trial court then took up the pending motion for continuance and surprised both defense attorneys by granting both their motions for continuance. The case was then set for April 3, 1989.

■ Even though the trial judge ultimately granted defendants' motion for continuance, we believe that the Cottonbelt's motion for change of venue was motivated by the desire to delay trial. The January 23, 1989, hearing transcript is replete with references to the

Cottonbelt's attorney's need for a continuance. Clearly, the Cottonbelt's attorney was manipulating the procedures of the court in order to gain a continuance. After simultaneously filing the motion for change of venue, motion to bar plaintiff's experts, and motion for continuance, the Cottonbelt's attorney asked the court to address his motion for continuance. Had the Cottonbelt truly believed that the trial judge was prejudiced against its cause, the Cottonbelt's attorney would have asked the trial court to first address its motion for change of venue as the first matter before the court. We, therefore, conclude that the Cottonbelt's motion for change of venue was motivated by the goal of delaying trial.

We also believe that the Cottonbelt further attempted to manipulate the procedural rules by extensively participating in the pretrial conference without pointing out to the trial court that a motion for change of venue had been filed. At least two of our sister courts have recognized the potential for abuse which can arise when litigants retain an absolute right to a change of venue. In *Fennema v. Joyce* (1972), 6 Ill. App. 3d 108, 285 N.E.2d 156, our brothers in the first district reversed the trial court's denial of the plaintiff's motion for a change of venue, but explained:

> "We are not prepared to hold that a pre-trial conference could never render untimely a Motion for Change of Venue, for we recognize the potential for abuse in a rule which would allow litigants to test the disposition of a trial judge during pre-trial, while retaining an absolute right to a change of venue." (6 Ill. App. 3d at 111, 285 N.E.2d at 158.)

(See also *Becker v. R.E. Cooper Corp.* (1990), 193 Ill. App. 3d 459, 464, 550 N.E.2d 236, 239.) Even though the trial court did not rule on the motion to continue or the motion to bar plaintiff's experts prior to the time the motion for change of venue was considered, the Cottonbelt's attorney was clearly testing the temperament of the trial court not only on the motion to continue, but also on the motion to bar plaintiff's experts. Therefore, under the present facts, we find that the trial court did not err in denying the Cottonbelt's motion for change of venue.

 █ The next issue the Cottonbelt asks us to address is whether the injury incurred by plaintiff was within the scope of injuries intended to be covered by the indemnification agreement. The Cottonbelt initially argues that the accident involved a train of the Cottonbelt and a hopper car of the Terminal, making paragraph 9(a) of the contract inapplicable. We disagree. Paragraph 9(a) of the contract provides:

"(a) Whenever the trains, locomotives, or cars of one party hereto are involved in an accident without the trains, locomotives, or cars of the other party hereto being involved, the party whose trains, locomotives, or cars are involved shall be separately and individually liable for and shall forever indemnify and save harmless the other party hereto from all expenses and liability for loss of and damage to property of any kind (including property of either party hereto) and injury (including death) to persons regardless of the cause or causes of such accident."

A car of the Cottonbelt was undeniably involved. The question then becomes whether a car of the Terminal was involved. While a Terminal crew had recently switched the hopper car into which the Cottonbelt's train collided, the evidence is uncontroverted that the hopper car was owned by Enron Chemical. As pointed out by both parties, it is an accepted rule of construction that words be given their usual and customary meaning. (*Marshall Field & Co. v. J.B. Noelle Co.* (1967), 81 Ill. App. 2d 409, 226 N.E.2d 454.) Quoting from the same dictionary, both parties give separate definitions of the word "of." The Cottonbelt explains, "The word 'of' is used as a function word to indicate the place or thing from which anything comes." (See Webster's Third New International Dictionary 1565 (1976).) The Terminal states that " 'Of' is a preposition meaning 'belonging to.' " (See Webster's Third New International Dictionary 1565 (1976).) Contracts must receive a reasonable construction, and a reasonable construction will be preferred to one which is unreasonable. (*Marshall Field & Co. v. J.B. Noelle Co.* (1967), 81 Ill. App. 2d 409, 226 N.E.2d 454.) In the instant case, we believe the reasonable construction of the word "of" connotes ownership. We hold that paragraph 9(a) is applicable to the instant situation and that only a train car of the Cottonbelt was involved. Even assuming, *arguendo*, that because the Terminal had recently switched the hopper car that act made the hopper car a car of the Terminal, the Cottonbelt would still be required to indemnify the Terminal under paragraph 9(b) of the contract, which states:

"(b) In all cases of collision between the trains, locomotives, or cars operated by one party hereto and the trains, locomotives, or cars operated by the other party, each party hereto shall assume responsibility for loss of and damage to the trains, locomotives, or cars operated by it and injury (including death) to its employees on such trains, locomotives, or cars, regardless of the cause or causes of such collision. Injury (including death) to all other persons and loss or damage to all other property

(including the joint section) shall be shared equally to the parties hereto."

Clearly, if the hopper car is considered to be a car *of* the Terminal by virtue of the fact that it had recently been switched by a Terminal crew, then it would have been a car "operated by" the Terminal. Paragraph 9(b) clearly states that when cars operated by both parties are involved in a collision, each party is responsible for the injuries incurred by its employees. Therefore, under both paragraphs 9(a) and 9(b), the Cottonbelt is required to indemnify the Terminal. We find that the trial court did not err in finding that under the contract the Cottonbelt was required to indemnify the Terminal.

The Cottonbelt next contends that paragraphs 9(a) and 9(b) are not broad enough to indemnify the Terminal against its own negligence. The Terminal replies that the indemnity provisions are clear and unambiguous and broad enough to indemnify it against claims arising out of its own negligence. We agree.

■■ Contracts of indemnity are generally regarded as valid and enforceable. However, the nature of such a contract requires that the agreement be strictly construed against the indemnitee. As stated by our supreme court in *Westinghouse Electric Elevator Co. v. La Salle Monroe Building Corp.* (1946), 395 Ill. 429, 70 N.E.2d 604:

> "It is quite generally held that an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract, [citations] or such intention is expressed in unequivocal terms." (395 Ill. at 433, 70 N.E.2d at 607.)

Our supreme court has also stated that when interpreting indemnity provisions:

> "[T]he contractual provisions involved are so varied that each must stand on its own language and little is to be gained by an attempt to analyze, distinguish or reconcile the decisions. The only guidance afforded is found in the accepted rule of interpretation which requires that the agreement be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions." (*Tatar v. Maxon Construction Co.* (1973), 54 Ill. 2d 64, 67, 294 N.E.2d 272, 273.)

Moreover, it is not necessary that specific reference to indemnification against liability arising out of the indemnitee's negligence be provided for in the agreement. *Spurr v. La Salle Construction Co.* (7th Cir. 1967), 385 F.2d 322; *Ahlvers v. Terminal R.R. Association* (1975), 31 Ill. App. 3d 166, 171, 334 N.E.2d 329, 333.

■■ We believe that the terminal has met the requirements which

must be met for a party to exculpate itself from its own negligence. The language "regardless of the cause or causes of such accident" is broad enough to include the Terminal's own negligence. To hold otherwise would, in effect, mandate that the word "negligence" must be specifically included in the language of the contract in order to provide indemnification for one's own negligence. We decline to make such language mandatory and find that the general inclusive language in the instant case was sufficient.

The Cottonbelt analogizes the language found in the contract in the case of *McGinn v. Northwestern Steel & Wire Co.* (1978), 68 Ill. App. 3d 632, 386 N.E.2d 71, to the language in the present case. The indemnification provision in *McGinn* provided:

> "INDEMNIFICATION—If this purchase order requires the performance of work or services on Purchaser's [Northwestern's] property, then Seller [M & M] shall indemnify and save harmless Purchaser of and from (a) all claims which may be made against Purchaser by reason of any injury or damage suffered or sustained by any person, firm or corporation caused by or alleged to have been caused by an act or ommission [*sic*], negligent or otherwise, of Seller or of Seller's employees, workmen, servants or agents; (b) and and [*sic*] injury or damage to Purchaser's property occupied or used by or in proximity to the site of the work caused by an act or omission, negligent or otherwise, of Seller or of Seller's employees, servants or agents; and (c) all claims which may be made against Purchaser by reason of any injury or damage, *however caused*, which may be suffered or sustained by employees, workmen, servants or agents of Seller." (Emphasis added.) (68 Ill. App. 3d at 635, 386 N.E.2d at 74.)

We find such language distinguishable. The contract in *McGinn* provided three separate levels on which liability could be based. Paragraphs (a) and (b) clearly stated that the subcontractor was only indemnifying the general contractor for the subcontractor's own actions. Therefore, the *McGinn* court refused to expand clause (c), even with the language "however caused" to include indemnification for the indemnitee's own negligence. In the instant case, there is no such distinction between paragraphs (a) and (b). Both paragraphs contain the language "regardless of the cause or causes." Therefore, the Cottonbelt's argument that the language "however caused" is analogous to "regardless of the cause or causes" is unconvincing. Accordingly, based solely on the sufficiency of the language, we find that the indemnity provisions in the instant case clearly and unequivocally pro-

vide that the Cottonbelt indemnify the Terminal for its own negligence.

The next issue we are asked to address is related to the indemnity agreement. We are asked to consider whether the trial court erred in ruling that the affirmative defense of acquiescence was inapplicable. The Cottonbelt contends that the defense of acquiescence can be valid even if there is an express indemnity agreement. The Terminal, on the other hand, contends that the defense of acquiescence has no application to a cause of action for contractual indemnity. We agree.

 Illinois courts have not yet considered the question whether the defense of acquiescence is valid when an indemnity agreement exists between the parties. Other jurisdictions which have considered this question have found a basis for the defense of acquiescence in section 95 of the Restatement of Restitution, which provides:

"§95: Person Responsible for a Dangerous Condition.

Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition." (Restatement of Restitution §95 (1937).)

The Cottonbelt cites to the case of *Pennsylvania R.R. Co. v. Erie Avenue Warehouse Co.* (3d Cir. 1962), 302 F.2d 843, in support of its contention that the defense of acquiescence is valid even where there is an express indemnity agreement. However, in the *Erie Avenue Warehouse Co.* case, Pennsylvania law was applied. We decline to follow the Pennsylvania court. Instead, where, as in the instant case, there is a contract of indemnity, the rights of the indemnitee as against the indemnitor must be determined by the provisions of the contract. We find that when a court is firmly convinced, as we are here, that the indemnification agreement permits the indemnitee to recover for its own negligence, the defense of acquiescence is invalid. (*Missouri Pacific R.R. Co. v. Arkansas Oak Flooring Co.* (8th Cir. 1970), 434 F.2d 575, 579; see also *Doyle v. Pacific Telephone & Telegraph Co.* (1962), 202 Cal. App. 2d 708, 21 Cal. Rptr. 326.) Therefore, we find that the trial court did not err in ruling that the defense of acquiescence was inapplicable.

██ The final issue we are asked to address is whether the Cottonbelt is entitled to further proceedings to ascertain whether the set-

tlement between the Terminal and plaintiff included money for punitive damages. The Cottonbelt argues that the $1,250,000 settlement between plaintiff and the Terminal, which was $250,000 more than the settlement between plaintiff and the Cottonbelt, included money for punitive damages; therefore, the Cottonbelt is not required to indemnify the Terminal for that portion of the settlement which constituted payment for punitive damages. The Cottonbelt argues that the case must be remanded for further proceedings to determine whether the settlement between the Terminal and plaintiff included any money for punitive damages. The Terminal replies that any objection the Cottonbelt may have had concerning the settlement between plaintiff and the Terminal has been waived. We agree.

On April 3, 1989, a settlement hearing was held. All parties were represented by counsel at the hearing. Counsel for the Terminal specifically stated that the $1,250,000 to be paid by the Terminal was for actual damages and that no part of that money constituted payment for punitive damages. Plaintiff's count for punitive damages was voluntarily dismissed with prejudice. All parties were given an opportunity to object to the settlement, but no objections were made. The trial court found that the settlements were in good faith. Therefore, we find that the Cottonbelt's contention that part of the settlement between the Terminal and plaintiff constituted payment for punitive damages has been waived. See *Barreto v. City of Waukegan* (1985), 133 Ill. App. 3d 119, 478 N.E.2d 581 (where it was found that the trial court did not abuse its discretion by refusing to conduct an evidentiary hearing on whether settlement between the plaintiff and one of the defendants was made in good faith, given the fact that the second defendant was aware of the settlement conferences prior to trial and was also given an opportunity to settle but chose not to, and did not allege bad faith either at the settlement hearing or by filing written objections).

In reply to the waiver issue, the Cottonbelt contends that requiring it to object at the settlement conference would be engrafting a restriction on the favored right to settle directly with a plaintiff. However, we find that not to require the Cottonbelt to object would be even more contradictory to the policy in Illinois that encourages voluntary and peaceful resolution of disputes through settlement. *McKanna v. Duo-Fast Corp.* (1987), 161 Ill. App. 3d 518, 515 N.E.2d 157.

A settlement is not considered made in bad faith simply because its purpose is to eliminate third-party liability. (*Dixon v. Northwestern Publishing Co.* (1988), 166 Ill. App. 3d 745, 752, 520 N.E.2d 932, 937.) By not requiring the Cottonbelt to object to the good-faith

nature of the settlement, we believe we would be discouraging defendants, similar in situation to the Terminal, from settling their disputes with plaintiffs. Such defendants would settle believing that they had eliminated any third-party liability, only to find after the settlement had been accepted by the trial court and had been found to be in good faith, that they may be further liable to another defendant. Such a possibility would greatly discourage settlement. Therefore, we find that the Cottonbelt has waived any objection it may have had concerning whether any of the $1,250,000 settlement between plaintiff and the Terminal constituted punitive damages.

For the foregoing reasons, the order of the circuit court of Madison County is affirmed.

Affirmed.

LEWIS and HOWERTON, JJ., concur.