# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Henry v. Waller*, 2012 IL App (1st) 102068

---

| | |
|---|---|
| Appellate Court Caption | PAMELA HENRY, Plaintiff, v. HARVEY JACK WALLER, Individually and d/b/a Harvey Waller, Harvey Waller, Ltd., Firsch and Waller, and Harvey Waller and Associates; and HARVEY WALLER, LTD., Defendants-Appellees (Bank of America, Defendant-Appellant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2068 |
| Filed | June 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant bank was entitled to the fees and costs it incurred in litigation arising from the allegedly fraudulent endorsement and deposit of two checks defendant attorney obtained in the settlement of a judgment he was retained by a collection agency to collect, notwithstanding the attorney's contention that the fees and costs arose from the criminal actions of a person at the agency who stole the funds due the judgment creditor, since defendant attorney deposited the fraudulently endorsed checks into his trust account, he sent the agency certified checks representing the funds, the agency paid the attorney his fee, the remaining fees were stolen and the terms of the indemnification agreement the attorney had with the bank applied. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-11515; the Hon. Daniel J. Lynch, Judge, presiding. |

| Judgment | Reversed and remanded. |
| --- | --- |
| Counsel on Appeal | Mark E. Wilson and Meghan W. Welch, both of Kerns, Frost & Perlman, LLC, of Chicago, for appellant. |
| | Joshua Sachs, of Joshua Sachs & Associates, of Evanston, for appellees. |
| Panel | JUSTICE PALMER delivered the judgment of the court, with opinion. Justice Garcia specially concurred, with opinion. Justice Lampkin dissented, with opinion. |

**OPINION**

¶ 1  This appeal involves an indemnification agreement in an "Interest on Lawyers Trust Account" (IOLTA). Specifically, at all relevant times, defendant Harvey Waller, an attorney, held an IOLTA account at Bank of America and its predecessor in interest, LaSalle Talman FSB (collectively, Bank of America or the bank). One of the resolutions governing this account contained an indemnification agreement requiring Waller to indemnify the bank for attorney fees and costs that it incurred under certain circumstances. After prevailing in the underlying litigation involving the negotiation of checks with allegedly forged signatures, Bank of America filed a petition seeking attorney fees and costs from Waller that it allegedly incurred while defending the underlying litigation. Bank of America sought fees and expenses pursuant to the indemnification agreement and under certain provisions of the Illinois Uniform Commercial Code (UCC) (810 ILCS 5/1-101 *et seq.* (West 2006)). Following a bench trial, the circuit court found that Waller was not obligated to indemnify the bank and entered judgment in his favor. Bank of America appeals, contending that the circuit court erred as a matter of law in denying its petition for attorney fees under the indemnification agreement and in finding that the bank was not owed attorney fees under the UCC. The bank also challenges the circuit court's denial of a motion *in limine* that it filed prior to trial seeking to bar the testimony of an expert witness. For the reasons that follow, we reverse and remand to the circuit court.

¶ 2                                        BACKGROUND

¶ 3  The relevant facts of this case are not in dispute. In 1993, plaintiff Pamela Henry received a $500,000 judgment against her husband in a marriage dissolution proceeding. Henry engaged defendant Jeffrey Olson of the collection agency Olson, Olson & Olson Ltd., to recover that judgment. In October 1998, Henry signed a limited power-of-attorney agreement in connection with her engagement of the Olson firm.

¶ 4  The Olson firm then hired defendant Waller to assist in collecting the judgment. The

Olson firm and Waller negotiated a $450,000 settlement of the divorce judgment. The parties stipulated at trial that Henry orally agreed to a settlement in that amount. In December 1998, Waller received the settlement in two cashier's checks payable to "Pamela A. Henry and Harvey Waller" in the amounts of $150,000 and $300,000. Waller did not send the checks to Henry for her endorsement before depositing them into his IOLTA account at LaSalle Bank. It is undisputed that at some point prior to Waller endorsing and depositing the checks, they were endorsed with the signature "Pamela Henry." There was no evidence presented at trial as to how the signatures in Henry's name appeared on the back of each check. Henry testified in an evidence deposition that she "never touched" the checks and the parties stipulated at trial that Henry's endorsements were "not authentic."

¶ 5        Waller endorsed and deposited each check into his IOLTA account at the bank. The parties stipulated at trial that the bank accepted in good faith the checks deposited in Waller's IOLTA account. Waller then caused the bank to issue two cashiers checks payable to the Olson firm for the entire amount of the settlement proceeds and Olson thereafter paid Waller $75,000. Henry did not receive any of the settlement money from Olson, who allegedly stole the money and disappeared. Olson has never been found. In 1999, Henry sued Olson and his firm but was unable to serve the complaint and summons on them.

¶ 6        In 2000, Henry amended her complaint to sue the bank and Waller, asserting that the endorsement signatures in her name on the back of the cashier's checks were forgeries. In her legal malpractice, breach of contract and fraudulent transfer claims against Waller, Henry alleged that Waller failed to procure her signature on the settlement checks, failed to pay the settlement proceeds to her and failed to communicate with her regarding the settlement. Henry also sued the bank under section 3-420 of the UCC (810 ILCS 5/3-420 (West 2006)), alleging that the endorsements in her name on the settlement checks were unauthorized and that the bank was liable for conversion because it accepted the checks for deposit over unauthorized signatures.

¶ 7        Bank of America, as successor in interest to LaSalle Bank, ultimately moved for summary judgment. The motion included affidavits from two expert witnesses, who opined that the bank had exercised ordinary care and had no liability under the comparative negligence scheme of the UCC. The circuit court granted the bank's motion, finding under section 3-405(b) of the UCC (810 ILCS 5/3-405(b) (West 2006)) that Henry had not presented any evidence that the bank failed to exercise ordinary care in its handling of the checks, and that the bank's acceptance of the checks did not cause any harm to Henry. Henry and Waller ultimately reached a settlement agreement with respect to the professional negligence dispute.

¶ 8        Bank of America then filed a petition for attorney fees and expenses against Waller, seeking to collect $225,000 in attorney fees and expenses it incurred during the 11 years of litigation in the Henry matter. The bank sought fees on two alternative grounds. First, the bank claimed that Waller contractually agreed to indemnify it pursuant to the terms of his account agreement. Second, the bank sought fees and expenses under the transfer warranty provisions of the UCC. See 810 ILCS 5/4-207(a), 3-416(a) (West 2006).

¶ 9        A bench trial was held on the petition. Prior to trial, the bank filed a motion *in limine*,

seeking to bar the testimony of Waller's expert witness, Robert Markoff, a collection lawyer. The trial court denied that motion. Markoff testified that Waller would have had the authority as Henry's attorney to endorse her signature on the checks and deposit them. The bank presented the testimony of David Mulvihill, the bank's in-house attorney who oversaw the litigation. Mulvihill testified about the account resolutions and that the bank incurred attorney fees and expenses as a result of actions it took under specific account resolutions. The bank also presented Henry's evidence deposition, the relevant testimony from which we set out above.

¶ 10    The trial court denied the bank's petition for attorney fees and costs, ruling that Waller's negotiation of the checks through his account neither triggered the indemnification provisions of his account agreement nor breached the UCC transfer warranties. With respect to Bank of America's contractual claim for indemnification, the court stated that the negotiation of the checks through the bank by Waller was "uneventful" and therefore "was not a triggering event for the contractual indemnification obligations of this contract." Instead, the court stated, the cause of action was triggered by a "subsequent conversion" by Olson. The court reasoned that the bank was not entitled to indemnification because "[t]he conversion here followed the otherwise proper settlement negotiations and the negotiable instrument acts herein through [the bank]. *** This case sounds in criminal theft and in conversion, not in breach of warrant[y] or certainly not in breach of the [UCC]." Bank of America appeals.

¶ 11                                    ANALYSIS

¶ 12    Bank of America first contends that the trial court erred as a matter of law in construing the terms of the account agreement and holding that the bank was not entitled to be indemnified for its attorney fees and expenses. The bank claims that it incurred those fees and expenses in connection with actions it took under two resolutions governing Waller's account and that it is therefore entitled to indemnification.

¶ 13    Bank of America's contention raises an issue of contract interpretation. The interpretation of a contract presents a question of law, which we review *de novo*. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007); see also *Erlenbush v. Largent*, 353 Ill. App. 3d 949, 952 (2004) (the appellate court reviews the circuit court's interpretation of a fee-shifting agreement *de novo*).

¶ 14    The indemnification agreement at issue in this case states:

"2) In order to induce said Bank to act pursuant to the foregoing resolutions, this Corporation hereby agrees as follows:

* * *

(c) To indemnify the Bank and save it free and harmless from any and all claims, demands, expenses (including attorney fees and costs), losses or damages it may suffer resulting from or growing out of or in connection with any act taken by the Bank as a result of, or its failure to act under any or all the foregoing resolutions, or its failure not

-4-

to conform in all respsects to the authorizations specified hereunder."[1]

The "foregoing resolutions" referred to in the indemnity agreement include resolution II, which states that Waller was authorized to "endorse for negotiation, negotiate, and receive the proceeds of any negotiable instruments or orders for the payment of money payable to or belonging to this Corporation." Additionally, resolution I provides that for checks and other like obligations endorsed by Waller and deposited into the account, "all prior endorsements are guaranteed by this Corporation whether or not an express guaranty is incorporated in this Corporations's endorsement."

¶ 15        Indemnification agreements are contracts and are subject to the ordinary rules of contract interpretation. *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 308 (2008). When construing the language of an indemnity agreement, our primary objective is to give effect to the intent possessed by the parties at the time they entered the agreement. *Buenz*, 227 Ill. 2d at 308. Where the terms of a contract are clear and unambiguous, they will be given their natural and ordinary meaning. *Buenz*, 227 Ill. 2d at 308. When there is no ambiguity in the language of the agreement, courts should not adopt a strict construction of that language that reaches a different result from that intended by the parties. *Higgins v. Kleronomos*, 121 Ill. App. 3d 316, 321 (1984).

¶ 16        Applying these principles to the present case, the indemnification agreement clearly and unambiguously requires Waller to indemnify Bank of America for "*any and all*" attorney fees and expenses it incurs resulting from "*any act*" taken by the bank under any of the account resolutions. (Emphases added.) Based upon the undisputed facts of this case, we conclude, as a matter of law, that the bank acted under two account resolutions and that those actions resulted in the bank incurring attorney fees and costs for which it is contractually entitled to be indemnified. The essence of Henry's complaint against the bank was that it was liable for conversion because it allowed Waller to negotiate the two settlement checks for deposit that contained forgeries of Henry's endorsement. The bank's actions in this respect were first taken under resolution II, which specifically authorized Waller to endorse, negotiate and receive the proceeds of any negotiable instrument. Moreover, in accepting the checks for deposit and crediting Waller's account, the bank relied on Waller's guarantee of Henry's prior endorsement on those checks. The bank's actions were therefore also taken under resolution I, pursuant to which Waller guaranteed all prior endorsements on all items deposited into his account. The bank was sued by Henry for these specific acts and it thus incurred attorney fees and costs as a result of actions it took under the account resolutions. Accordingly, Waller's obligation to indemnify the bank for those attorney fees and costs under the IOLTA agreement was triggered.

¶ 17        Waller argues that the indemnification agreement was not triggered because he acted as an "innocent depositor" whose actions did not cause the bank to incur those expenses.

_____

[1]Waller opened the IOLTA account through an entity called "Harvey Waller, Ltd." However, the parties stipulated at trial that the Illinois Secretary of State dissolved that entity on May 1, 1991. Additionally, Waller agrees that in this case, he personally was the account holder and that the corporate resolutions governing the account agreement apply to him personally.

Instead, Waller asserts, the attorney fees and costs incurred by the bank were the result of Olson's criminal actions and, as such, those fees and expenses fall outside the scope of the indemnification agreement.

¶ 18 Waller essentially argues that his obligations under the indemnity agreement would be triggered in this case only if he, as opposed to Olson, converted the settlement checks or forged Henry's endorsement on them. We disagree. The indemnification agreement contains no language limiting Waller's obligation to indemnify the bank to those situations in which he acts criminally by converting checks or forging endorsements. In other words, the indemnification agreement does not limit the obligation to indemnify to situations in which Waller's actions, as opposed to those of a third party such as Olson, were the direct and immediate cause of the bank incurring attorney fees. The indemnification agreement is triggered whenever the bank is compelled to incur attorney fees and costs by virtue of the bank account held and utilized by the depositor. In fact, under the plain and ordinary language of the agreement, it does not matter whether the checks were converted or whether the endorsements on the checks were actually forged. It also does not matter whether Waller had authority to endorse Henry's name on the checks under the limited power of attorney or that Olson is the person alleged to have stolen the money and disappeared. Because the language of the indemnity agreement is clear and unambiguous, we decline to adopt the narrow construction urged by Waller to limit its scope. See *Higgins*, 121 Ill. App. 3d at 321.

¶ 19 Instead, to determine whether the obligation to indemnify has been triggered, the only relevant question under the indemnity agreement is whether the bank incurred attorney fees and costs "resulting from or growing out of or in connection with any act" it took under any of the account resolutions. The bank did so in this case when it was sued by Henry because it accepted for deposit the two checks that contained allegedly forged endorsements and then credited Waller's account in the amount of those checks.

¶ 20 Waller raises concerns about the fairness of construing the indemnity agreement in what he characterizes as a "broad," "open ended" and "unlimited" manner so as to hold him liable for the bank's attorney fees based upon Olson's criminal acts. We note, however, that parties are free to portion out risk as they see fit. *Evans v. Lima Lima Flight Team, Inc.*, 373 Ill. App. 3d 407, 412 (2007); *Hartford Fire Insurance Co. v. Architectural Management, Inc.*, 194 Ill. App. 3d 110, 117 (1990). From a commonsense point of view, it is clear to this court that no bank would willingly undertake the risk of incurring attorney fees and costs of the magnitude incurred here in return for the privilege of providing a depositor with an IOLTA account that generates a relatively small amount of bank fees. Indemnity agreements exist to address circumstances such as those before us. We note that when counsel for the appellee was asked at oral argument how the indemnity agreement could have been made any clearer in advance to insulate the bank from these expenses, no adequate response was forthcoming.

¶ 21 Indemnification agreements are also generally valid and enforceable contracts. *Hader v. St. Louis Southwestern Ry. Co.*, 207 Ill. App. 3d 1001, 1011 (1991); see also *Scott Stainless Steel, Inc. v. NBD Chicago Bank*, 253 Ill. App. 3d 256, 261-62 (1993) (indemnification agreement between bank and customer was a valid and enforceable contract under the UCC). Bank of America is not seeking to be indemnified for its own negligence; the trial court expressly found that the bank exercised ordinary care in its handling of the checks. While it

is Olson who is alleged to have stolen the settlement funds, Olson is a stranger to the bank. It was Waller who triggered the bank's involvement in this case by doing business with Olson; the bank had no control over that decision. Protecting against remote and unforeseeable risks presented by a third party such as Olson is one of the primary reasons that banks negotiate indemnity agreements into their contracts with account holders such as Waller. To impose a limitation on the indemnification agreement that is not found in the plain and unambiguous language of the contract would frustrate the purpose of indemnity agreements and the ability of banks and other parties to freely negotiate them into contracts. Because the language of the indemnity agreement is clear and unambiguous, we will enforce it as written and we will not read limitations into the contract to reach what Waller deems to be a more equitable result. See *Tatar v. Maxon Construction Co.*, 54 Ill. 2d 64, 67 (1973) (" '[U]nless a contract is ambiguous, its meaning must be determined from the words used; and courts will not, because a more equitable result might be reached thereby, construe into the contract provisions that are not contained therein.' " (quoting *Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp.*, 395 Ill. 429, 432 (1946))).

¶ 22    Waller also claims that the bank has not cited authority applying what he characterizes as a "non-negotiated" indemnity provision under the circumstances presented in this case. Waller's characterization of the indemnity provision as a sort of contract of adhesion is inaccurate. Waller was free to attempt to negotiate a different contract with the bank or to open an account at a different banking institution if he was unable to negotiate the contract he preferred with Bank of America. There is no dispute that Waller freely and voluntarily entered into the contract with the bank and thereby agreed to the indemnification provision contained therein. And although neither party has presented this court with a case involving the same facts as those in the present case, our supreme court has observed that due to the varying nature of indemnity provisions, each case involving their interpretation must be decided based upon the language of the contract. See *Tatar*, 54 Ill. 2d at 67. The court has specifically stated:

> "We have examined the authorities cited by the parties and many of those collected [in the American Law Reports], and conclude that the contractual provisions involved are so varied that each must stand on its own language and little is to be gained by an attempt to analyze, distinguish or reconcile the decisions. The only guidance afforded is found in the accepted rule of interpretation which requires that the agreement be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions." *Tatar*, 54 Ill. 2d at 67.

¶ 23    Bank of America also contends that it was entitled to attorney fees and costs under provisions of the UCC. However, in light of our conclusion that the bank is entitled to indemnification under the terms of the indemnity agreement, we need not consider whether the bank would also be entitled to those fees and costs under the UCC.

¶ 24    Finally, the bank contends that the trial court abused its discretion when it denied its motion *in limine* to bar the expert testimony of Robert Markoff. At trial, Markoff essentially testified that under the limited power of attorney signed by Henry, Waller would have had the authority as Henry's lawyer to endorse her signature on the checks and deposit them. Markoff's testimony goes to the larger issue of whether Waller was at fault in negotiating the

settlement checks for deposit. However, as explained above, Waller's alleged negligence is not relevant to the bank's right to indemnification. It matters not that Waller, Olson or any other party was at fault or whether Waller would have had authority to endorse Henry's name under the limited power of attorney. The indemnification agreement concerned only whether Bank of America incurred attorney fees and costs by virtue of the accounts under resolutions I and II.

¶ 25    Because the trial court never reached the question of the amount of attorney fees and costs to which Bank of America is entitled, we remand this case to the trial court for a hearing on that issue.

¶ 26                                    CONCLUSION

¶ 27    For the reasons stated, we reverse the judgment of the circuit court of Cook County denying the bank's petition for attorney fees and costs and remand the case to the circuit court.

¶ 28    Reversed and remanded.

¶ 29    JUSTICE GARCIA, specially concurring.

¶ 30    I agree with Justice Palmer. Attorney Waller's deposit of two checks made payable to "Pamela A. Henry and Harvey Waller" into his IOLTA account is the legal basis of Ms. Henry's complaint against Bank of America (the Henry litigation), which triggered the indemnity provision. *Supra* ¶ 16. I add a few words to explain where attorney Waller went wrong.

¶ 31    His fundamental mistake was the failure to recognize that, in addition to the duty of care he owed to the Olson firm as the party that retained him, under the facts of this case he also owed a duty of care to Ms. Henry as the clear beneficiary of the collection efforts he was retained to perform. See *Pelham v. Griesheimer*, 92 Ill. 2d 13, 21 (1982) (a duty of care to a third party arises whenever the evidence establishes "that the primary purpose and intent of the attorney-client relationship itself was to benefit *** the third party"). As confirmed by his settlement of Ms. Henry's claim, attorney Waller violated his duty of care to Ms. Henry, which arose no later than when he deposited the two settlement checks that bore Ms. Henry's name, which in turn brought the Henry litigation to the door of Bank of America. The breach occurred when he issued the IOLTA check to Olson without protecting Ms. Henry as the real person in interest in the collection effort.

¶ 32    Although he may be correct, as he intimates, that his deposit of the two settlement checks totaling $450,000 with the unauthorized signature of Ms. Henry violated no legal duty, there is also no dispute that Bank of America accepted the deposit of the settlement checks under the resolutions governing the IOLTA account. Based on that deposit, Ms. Henry could not have sued Bank of America without also suing attorney Waller and, between the two, only he breached a duty to Ms. Henry.

¶ 33    The circuit court got it wrong when it concluded that Ms. Henry's suit, which had the

-8-

starting point of the deposit of the settlement checks, did not trigger the indemnification provision because of the "uneventful" nature of the deposit as compared to Olson's clear criminal conduct, as our colleague in dissent argues. There is no persuasive authority for excluding the "innocent" act of a bank deposit from the protection afforded the bank in the indemnity provision; nor is there any authority for placing the risk of a third party engaging in criminal activity at the end point of bank transactions on the bank, as the dissent argues, rather than on the account holder. The "subsequent conversion" by Olson did not immunize Bank of America from being sued by Ms. Henry; nor did Olson's criminal conduct somehow immunize attorney Waller under the bank's indemnity provision.

¶ 34    I also question our dissenting colleague's characterization of Olson as a third party. *Infra* ¶ 37. Olson and Waller were client and attorney; to that extent, attorney Waller acted as Olson's agent. See *In re Marriage of Stephenson*, 2011 IL App (2d) 101214, ¶ 35 (the attorney-client relationship is one of principal and agent). Attorney Waller provided the means by which Olson was able to abscond with the proceeds of the settlement that belonged to Ms. Henry by issuing him the IOLTA check. I also disagree with the dissent's suggestion that our resolution of the indemnity issue should turn on the "meritless lawsuit against the Bank." *Infra* ¶ 38. The indemnity provision protected the bank regardless of the merits of the underlying lawsuit. To stop Bank of America's fees and costs from accumulating against him during the Henry litigation, attorney Waller should have concluded that he breached his duty to Ms. Henry sooner rather than 11 years later.

¶ 35    JUSTICE LAMPKIN, dissenting.

¶ 36    I dissent from the majority's decision that Waller was obligated to indemnify the bank pursuant to the terms of the parties' indemnification agreement. A twofold standard of review applies to this matter. Whereas *de novo* review is applied to the trial court's interpretation of the parties' fee-shifting agreement as a matter of law, the trial court's application of the terms of that agreement to the facts should be reviewed for an abuse of discretion. *Peleton v. McGivern's, Inc.*, 375 Ill. App. 3d 222, 225-26 (2007). I do not agree with the bank's characterization of the trial court's interpretation of the agreement as narrow; the trial court recognized that the broad indemnification provision protected the bank from losses that resulted from the bank's acts under Waller's IOLTA account resolutions. The trial court, however, determined that the bank's legal fees resulted from the criminal act of a third person rather than from the bank's acts under the account resolutions. That determination by the trial court was not an abuse of discretion.

¶ 37    In ruling against the bank's petition for fees and costs, the trial court found that Waller's negotiation of the settlement checks through his account and temporary possession of the settlement funds was "uneventful" and did not trigger the indemnification obligations of his account agreement. Specifically, the court found that Henry agreed to the $450,000 settlement and, pursuant to the terms of the limited power of attorney she had signed, fully authorized Olson and Waller, as Olson's agent, to negotiate the checks through Waller's account. Consequently, Waller and Olson properly and lawfully came into possession of the settlement proceeds for 90 days. Thereafter, however, $225,000 of the settlement funds were

-9-

converted, and the bank's losses resulted from or grew out of that subsequent conversion. Like the trial court, I would hold that the indemnification provision did not insulate the bank from litigation expenses that resulted from the criminal act of a third party.

¶ 38     The bank insists that its fees and expenses resulted directly from Henry's lawsuit and Henry sued the bank merely because it had handled the settlement funds. Doubtless the bank's role in properly clearing the checks through Waller's IOLTA account played a causal role in the conversion in the sense that no one could have absconded with the settlement funds if the settlement checks from Henry's ex-husband were never negotiated through a bank. That is not, however, an accurate application of the terms of the indemnification provision to the facts before this court and, thus, not a satisfactory basis for awarding the bank its litigation costs. One might as well say that anytime the bank is sued by the client of an attorney that uses an IOLTA account with the bank, the bank will be entitled to reimbursement from the attorney for any litigation costs. While such insulation from the risk of meritless lawsuits would certainly be an appealing arrangement for the bank, the indemnification agreement negotiated by the parties here does not obligate Waller to compensate the bank for the losses it sustained when Henry attempted to recoup her loss by filing a meritless lawsuit against the bank.[2]

¶ 39     The bank wrote the indemnification provision and must be bound by the clause that limits its right to indemnification to losses that resulted from or grew out of or in connection with the *bank's acts* in negotiating the settlement checks through Waller's account. Moreover, the record supports the trial court's determination that the bank's fees and costs in defending against the Henry litigation resulted from, grew out of, or were connected with Olson's subsequent criminal act of converting the settlement funds and not from the uneventful and authorized negotiation of the settlement checks through Waller's bank account.

¶ 40     Specifically, the limited power of attorney[3] signed by Henry authorized Olson and

---

[2]Henry's various allegations against Olson, Waller and the bank evolved over time in multiple lawsuits. Initially, she sued Olson and his firm for breach of contract. Later, she sued Waller in chancery court, alleging that Olson fraudulently transferred $225,000 to Waller and asserting that the transfer should be voided and Waller should be ordered to pay her $225,000. Later, Henry amended her claim against Waller to assert that the endorsement signatures in her name on the back of the cashier's checks were forgeries and to add the bank as a defendant.

[3]That limited power of attorney, which Henry, upon the advice of her divorce attorney, signed in October 1998, provided, in pertinent part:
   "I, Pamela Henry (Engel), grant a [*sic*] exclusive limited power of attorney to Olson, Olson and Olson & legal counsel to act as my attorney-in-fact.
   I give my attorney-in-fact the exclusive and maximum power under law to perform the following act on my behalf: to actively prosecute, proceed, negotiate and recover on the money judgment case # 89 D 9849 in the amount of $500,000 plus interest and court cost.
                                        * * *
   Judgment holder Pamela Henry (Engel) will receive 50% of the moneys collected on the judgment. Funds received from judgment debtor will be dispersed [*sic*] within ninety

Waller, as Olson's agent, to endorse the settlement checks for negotiation, negotiate the settlement checks through Waller's account, and receive for temporary possession the proceeds from the checks. When the banking transaction ended, the funds were properly in the hands of Henry's agent. Furthermore, the bank acted consistent with the account resolutions in negotiating the settlement checks through Waller's account. The parties agreed that Waller would indemnify the bank for attorney fees and court costs "it may suffer resulting from or growing out of or in connection with any act taken by the Bank as a result of" Waller's guarantee of endorsements on checks and negotiation of checks. Those terms, which are given their plain and ordinary meaning, do not state that the bank will be indemnified from any and all claims involving Waller's IOLTA account. Rather, Waller's indemnification obligation would be triggered by damages from the *bank's acts* under the account resolutions. The language of their contract does not indicate any intent by the parties that a remote cause which did not necessarily or immediately produce the injury would suffice to trigger Waller's indemnity obligation.

¶ 41    Support for the trial court's determination is found in *County of Pierce v. Suburban Bank of Elmhurst*, 815 F. Supp. 1124 (N.D. Ill. 1993). In that case, the county issued a warrant check payable to multiple payees for a project involving road improvements. *Id*. at 1125. The bank deposited the check in the proper account but technically violated the warranty of good title by failing to obtain the endorsements of all the payees on the warrant check. *Id*. One of the payees subsequently misappropriated the funds in the account and failed to pay the project creditors. *Id*. The county filed suit against the bank, but the trial court granted summary judgment in favor of the bank, finding that the county failed to show that it actually incurred damages as a result of the bank's actions. *Id*. at 1126-27. Specifically, the trial court found that, despite the bank's technical warranty violation of failing to verify the endorsement, the county's damages were the result of the misconduct of a payee after the check was deposited in the appropriate account. *Id*. Similarly here, the bank has failed to show that it incurred damages as a result of its actions under Waller's account resolutions.

¶ 42    Because I agree with the trial court's determination that the bank was not entitled to indemnification, I also address the bank's alternative argument that it is entitled to attorney fees and costs under Waller's UCC transfer warranties. Specifically, the bank argues the trial court erred as a matter of law in finding that Waller did not breach the UCC transfer warranties. By transferring the two settlement checks to the bank, Waller warranted to the bank that "all signatures [on the checks were] authentic and authorized." See 810 ILCS 5/3-416(a)(2), 4-207(a)(2) (West 2008). The bank contends Waller breached both those warranties because (1) the bank and Waller stipulated at trial that Henry's signatures on the two checks were not authentic, and an endorsement does not have to be a forgery in order to constitute a breach of the transfer warranty; and (2) "there was a complete failure of proof" at the trial to establish that the endorsements were authorized.

¶ 43    A trial court's application of the UCC to uncontroverted facts presents a question of law reviewed *de novo*. Here, however, the trial court applied the UCC to its determinations of

days of receipt of same."

fact following a trial on the merits. A trial court's purely legal findings are reviewed *de novo*, but its determinations of fact should be upheld unless they are contrary to the manifest weight of the evidence. *Salem National Bank v. Chapman*, 64 Ill. App. 3d 625, 628 (1978). The ultimate decision to award or deny attorney fees under the UCC is committed to the discretion of the trial court and is reviewed for an abuse of discretion. *Southern Provisions, Inc. v. Harris Trust & Savings Bank*, 96 Ill. App. 3d 745, 748 (1981).

¶ 44    The bank's argument challenging the authenticity of Henry's signatures on the checks is unavailing. When the bank asserts on appeal that Waller has already stipulated that the signatures were not authentic, the bank attempts to read more into the parties' stipulated facts for the bench trial than the parties had intended. It is clear from the record that the parties' stipulation that Henry's signatures on the two cashier's checks were "not authentic" simply meant that Henry herself did not sign her endorsement on those checks; Waller never conceded that the signatures were legally inauthentic for purposes of any provision of the UCC.

¶ 45    Furthermore, the bank cites no relevant authority to support the proposition that Henry's signature could only be authentic for purposes of the UCC if Henry herself actually signed the back of the settlement checks. Although the UCC does not define the term *authentic*, the bank's suggested meaning of the term is not supported by the statute. If, as the bank contends, *authentic* means that the signature on the check must be the actual, manuscript signature of the named person or entity, then the UCC provisions concerning an agent's or representative's authorized endorsement on behalf of the principal would be rendered meaningless. See, *e.g.*, 810 ILCS 5/3-401 (West 2010) (a person's liability on an instrument when signed by an agent or representative); 810 ILCS 5/3-402 (West 2010) (signature by a representative); 810 ILCS 5/3-405 (West 2010) (employer's responsibility for fraudulent indorsement by an employee). The fact that Henry herself did not write her name on the checks does not satisfy the bank's burden to prove a breach of the UCC transfer warranty due to an inauthentic endorsement.

¶ 46    The bank's argument that Henry's signatures on the checks were not authorized also lacks merit. On appeal, the bank attempts, without citation to any relevant authority, to attack the validity of the limited power of attorney by complaining that: Henry stated in her evidence deposition that she never authorized Olson, his firm, or anyone else to endorse the checks; no counterparty signed the limited power of attorney form with Henry; the form did not expressly convey authority to endorse the checks; and no evidence was presented at trial to establish that an authorized agent of the Olson firm actually signed the endorsement in Henry's name on the checks. Finally, the bank asserts that even if the limited power of attorney form constituted an agreement with any attorney-in-fact, the attorney-in-fact breached the agreement and, thus, lost any authority conveyed by the document.

¶ 47    The bank's failure to support these propositions by citation to relevant authority forfeits review of these arguments on appeal. Such forfeiture notwithstanding, the parties stipulated that Henry, upon the advice of her divorce attorney, signed the limited power of attorney in favor of Olson and his agents. Moreover, Henry approved the settlement negotiated by Waller. Consequently, Henry authorized the Olson firm and Waller to act as her agents.

Furthermore, the terms of the limited power of attorney were broad enough to confer on Olson and Waller the power to sign Henry's name on the back of the settlement checks and negotiate those checks through Waller's IOLTA. Accordingly, the trial court properly found as a matter of fact and law that Waller did not breach the UCC transfer warranty due to an unauthorized endorsement.

¶ 48 The bank has not met its burden to prove that Waller breached his transfer warranties. However, even assuming, *arguendo*, that Waller technically breached those warranties, any such breach did not cause the bank's loss. As discussed above, the bank's loss was the result of Olson's criminal act after Waller had negotiated the settlement checks through his account and Henry's meritless lawsuit. See *County of Pierce*, 815 F. Supp. at 1126-27.

¶ 49 Finally, the bank argues the trial court abused its discretion by allowing Waller's witness, Robert Markoff, to testify as an expert on Illinois collection practices in a case that did not involve any issues of collection law. The bank states that the trial court never made a finding that the limited power of attorney was ambiguous and Markoff improperly offered parol evidence to interpret that document. See *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 800-01 (2009) (court properly barred expert testimony that purported to offer legal conclusions and interpret the parties' agreement). According to the bank, the trial court relied heavily on Markoff's immaterial and irrelevant testimony.

¶ 50 The trial court is vested with broad discretion to determine the relevance and admissibility of evidence, including expert testimony. *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 4 (2007). If the trial court is found to have abused its discretion, relief on appeal is warranted only where the appellant can demonstrate prejudice. *Gill v. Foster*, 157 Ill. 2d 304, 317-18 (1993).

¶ 51 According to the record, Markoff opined that the limited power of attorney signed by Henry gave the Olson firm and its authorized agents, like Waller, the authority to sign Henry's name on the back of the settlement checks, negotiate the checks through the bank, and hold the settlement funds for 90 days before distributing the proceeds according to the terms of the compensation agreement between Olson and Henry. Markoff also opined that Waller did not breach any duty by following the limited power of attorney and sending the settlement proceeds to Olson instead of Henry.

¶ 52 Markoff also testified that, under the common practice in Illinois concerning debt collection, Waller had authority to sign Henry's name on the back of the checks and deposit the checks. Markoff explained the debt collection practice and how collection lawyers usually were engaged in a case. He stated that collection lawyers usually worked through an agent and had little contact with the judgment holder or client. By negotiating the checks through a client trust fund account, a collection lawyer ensured that the checks had cleared properly for both the judgment holder and payor. Furthermore, it was commonly accepted that a collection lawyer could sign or endorse checks on behalf of the client or judgment holder, even if that action was not explicitly stated in any agreement. Markoff explained that a collection lawyer's ability to endorse the checks eliminated the risk of sending endorsed checks through the mail. Furthermore, a collection lawyer's ability to endorse and deposit checks immediately benefitted the payor by preventing the accumulation of interest on the

judgment. In addition, checks had to be deposited and negotiated quickly before the funds disappeared or became affected by a payor's bankruptcy. Under the common practice, a collection lawyer remitted the funds to the collection agent with the collection lawyer's fee portion retained.

¶ 53　　The record establishes that the trial court did not abuse its discretion by allowing Markoff to testify regarding the debt collection practice. The bank presented the testimony of its assistant general counsel, who opined on the meaning of the contract provisions and the ultimate issues of whether Waller was in breach of transfer warranties and whether the bank had incurred legal fees within the scope of the indemnification clause. In turn, Waller presented Markoff's testimony, which provided background on the usage and customs of the debt collection practice. Both witnesses provided information on the underlying commercial context of this dispute and thereby assisted the fact determinations made by the trial judge.

¶ 54　　It is also clear that, in this bench trial, the trial judge understood the proper purpose and limitation of Markoff's expert testimony. Although Markoff offered some parol evidence to interpret the limited power of attorney agreement, the record establishes that the trial court limited its consideration of Markoff's testimony to the subject of collection law and how a collection attorney in the normal and customary course of collection practice would have acted under a limited power of attorney. In a bench trial, in the absence of evidence to the contrary, it is presumed that the court considered only competent evidence and the admission of incompetent evidence is harmless. *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 389 (2004). The record here supports that presumption. Specifically, before the trial judge questioned Markoff, the judge stated that he was not interested in any of Markoff's legal conclusions but, rather, was concerned about the nature of the debt collection practice. Moreover, the trial judge stated in his oral ruling that he was particularly persuaded by Markoff's testimony about the "practices that prevail in the collection industry" and "the important reasons why attorneys have to negotiate" instruments like cashier's checks in a timely manner. The trial court properly considered Markoff's expert testimony only to the extent that it was relevant to the factual issues before the court.

¶ 55　　I would affirm the judgment of the circuit court, which denied the bank's petition for attorney fees and costs and considered only the admissible testimony of Waller's expert witness.